**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| LONGNECKER PROPERTY, et al., | ) | |
| | ) | |
| For Themselves and As Representatives | ) | |
| of a Class of Similarly Situated Persons, | ) | No. 09-173L |
| | ) | |
| Plaintiffs, | ) | Judge Marian Blank Horn |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**CLASS COUNSEL'S (1) REPLY TO PLAINTIFF/OBJECTOR
GRETCHEN MORRIS'S SEPTEMBER 24, 2014 LETTER; (2) REPLY TO THE
UNITED STATES' RESPONSE TO MOTION FOR APPROVAL OF FEES AND
PROPOSED DIVISION OF COMMON FUND; AND (3) STATEMENT
IN SUPPORT OF APPROVAL OF SETTLEMENT AND REQUESTED FEES**

## TABLE OF CONTENTS

I.    CLASS COUNSEL'S REPLY TO PLAINTIFF/OBJECTOR GRETCHEN
      MORRIS'S SEPTEMBER 14, 2014 LETTER.................................................................. 1

II.   CLASS COUNSEL'S REPLY TO THE UNITED STATES' RESPONSE TO
      MOTION FOR APPROVAL OF FEES AND DIVISION OF COMMON FUND .......... 5

      A.    The Common Fund Doctrine Applies…………………………………………..6

      B.    It is Appropriate to Award Fees Based Upon a Percentage of the Fund………….8

      C.    A Lodestar Cross-Check May or May Not Be Performed in the Court's
            Discretion, but the Ultimate Test is Based on the Seven Factors….…………… 10

III.  CLASS COUNSEL'S STATEMENT IN SUPPORT OF APPROVAL OF
      SETTLEMENT AND REQUESTED FEES .................................................................. 12

# TABLE OF AUTHORITIES

## Cases

*Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240 (1975) ............................ 6, 13

*Applegate v. United States*, 52 Fed. Cl. 751 (2002) ........................................................ 7

*Bishop v. United States*, No. 10-594L, 2013 U.S. Claims LEXIS 1126 .................................. 6, 11

*Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980) .......................................... 2, 5, 6, 8, 13

*Brytus v. Spang & Co.*, 203 F.3d 238 (3d Cir. 2000) ................................................... 4, 7

*Bywaters v. United States*, 670 F.3d 1221 (Fed. Cir. 2012) ................................... 3, 9, 10

*Goldberger v. Integrated Res. Inc.*, 209 F.3d 43 (2d Cir. 2000) .................................... 11

*Haggart v. United States*, 116 Fed. Cl 131 (2014) ............................................... passim

*Holbrook v. Pitt*, 748 F.2d 1168 (7th Cir. 1984) ........................................................ 7

*In re Fine Paper Antitrust Litig.*, 751 F.2d 562 (3rd Cir. 1984) ..................................... 4

*In Re: Cendent Corp. PRIDES Litig.*, 243 F.3d 722 (3d Cir. 2001) ............................... 11

*In Re: Certainteed Fiber Cement Siding Litig.,* 2014 WL 1096030 (E.D. PA. Mar. 20, 2014) ......................................................................................... 11

*In Re: Fannie Mae Sec. Litig.,* 2013 WL 6383000 (D.D.C. Dec. 6, 2013), ............................... 11

*Janssen v. United States*, No. 09-559L, 2013 U.S. Claims LEXIS 1794 (Fed. Cl. November 14, 2013) ...................................................................................... 6

*Knight v. United States*, 982 F.2d 1573 (Fed. Cir. 1983) ............................................. 7

*Miller v. United States*, No. 03-2489L (Fed. Cl. November 17, 2006) ................................. 6, 7

*Moore v. United States*, 63 Fed. Cl. 781 (2005) ............................................... passim

*Nilsen v. York Cnty.*, 400 F. Supp. 2d 266 (D. ME. 2005) ............................................. 11

*Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542 (2010) ............................................. 2, 3

*Raulerson v. United States*, 108 Fed. Cl. 675 (2013) .............................................. 6, 11

*Roeder Co. v. Burlington N.*, 716 P.2d 855 (Wash. 1986) ........................................... 17

*Staton v. Boeing Co.*, 327 F.3d 938, 967 (9th Cir. 2003) ................................... passim

*Sullivan v. DB Invs., Inc.* 677 F. 3d 273 (3d Cir. 2011).................................................. 11

*Venegas v. Mitchell*, 495 U.S. 82 (1990) ........................................................... 1, 2, 8, 13

**Statutes**

Fed. R. Civ. P. 23 (h)................................................................................................ 10

RCFC 23 (h)  ......................................................................................................... 10

 **Treatises**

*Theodore Eisenberg & Geoffrey P. Miller, Attorney Fees and Expenses in Class Action Settlements*: 1993-2008, 7 J. Imperial Legal Stud. 248 (June 2010). ...................................... 11

**Miscellaneous**

*Court Awarded Attorney Fees, Report of the Third Circuit Task Force on Court Awarded Attorney's Fees*, 108 F.R.D. 237 (1985) .................................................................. 11

*Third Circuit Task Force Report, Selection of Class Counsel*, 208 F.R.D. 340 (2002) .............. 11

At the Fairness Hearing held on September 26, 2014, it was decided that Class Counsel would, in one submission: (1) reply to Plaintiff/Objector Ms. Gretchen Morris's September 24, 2014 letter; (2) reply to the government's response (D.E. 107) to Class Counsel's fee motion; and (3) provide a written statement setting forth the oral presentation given at the Fairness Hearing.  Class Counsel hereby states as follows:

## I.     CLASS COUNSEL'S REPLY TO PLAINTIFF/OBJECTOR GRETCHEN MORRIS' SEPTEMBER 14, 2014 LETTER

While Class Counsel believes all of Ms. Morris's arguments were either explicitly or implicitly addressed in Class Counsel's response to her September 19, 2014 letter (D.E. 106.), Class Counsel submits the following reply to the statements contained in her September 24, 2014 letter:

Ms. Morris argues that "[t]he standard imposed by Rule 23(h) is precisely the same standard that is imposed by the URA: 'reasonable attorneys' fees.'"  That is an inaccurate statement, as it does not address the fact that fee shifting statutes deal with what is a reasonable fee for the defendant to have to pay the plaintiff.  Hence, what Ms. Morris's statement is really arguing is that Class Counsel is limited to only the fees under the fee-shifting statute.  That is simply not the law.

Fees under fee-shifting statutes and fees under common fund fee awards are different conceptual constructs that have developed separate clear case law.  As *Venegas* clearly states and other cases show, "fee-shifting statutes control what the losing defendant must pay, not what the prevailing plaintiffs must pay his lawyer."  *Venegas v. Mitchell*, 495 U.S. 82, 89 (1990).  Many cases cited by Plaintiffs (including all the CFC cases on the subject), and many cases cited in those cases, show that reasonable attorneys' fees awarded under the common fund theory often

1

are much greater than the statutory fee.  *See, e.g., Staton v. Boeing Co*., 327 F.3d 938, 967 (9th Cir. 2003) (*citing Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)).

Ms. Morris also argues that the Court in *Venegas* specifically distinguished its holding and as support quotes from *Venegas*: "What a plaintiff may be bound to pay and what an attorney is free to collect under a fee agreement are not necessarily measured by the **'reasonable attorney's fee'** that a defendant must pay pursuant to a court order." *Venegas*, 495 U.S. at 90 (emphasis added).  She then argues that there is no contract here, so "Class Counsel's recovery *is*—necessarily—measured by a 'reasonable attorneys' fee'—under the terms of Rule 23(h)."  This is a fundamental misunderstanding of the message of *Venegas,* and the law on this subject.  *Venegas* was specifically talking about the difference between statutory fees paid by the defendant being different from what an attorney can collect from a client.  The Ninth Circuit in *Staton*, when, interpreting *Venegas*, addressed the same baseless argument and said, "Common fund fees are essentially an equitable substitute for private fee agreements where a class benefits from an attorney's work," and further that "the same general principles outlined in Venegas should apply."  327 F.3d at 967.  As Judge Bruggink said in *Moore v. United States*, 63 Fed. Cl. 781, 786 (2005), "class counsel may request an award of fees from the common fund on the equitable notion that lawyers are entitled to reasonable compensation for their professional services **from those who accept the fruit of their labors**." (emphasis added).

Ms. Morris goes on to argue that a contingent percentage is not needed to compensate for litigation risk, as Class Counsel has stated here, and she then incorrectly asserts that the Supreme Court directly addressed and rejected Class Counsel's litigation risk argument in *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551-53 (2010), holding that the lodestar does compensate for certain aspects of that risk and that other aspects of the risk should not be compensated.  She

2

finishes by claiming Class Counsel "does not address the Supreme Court's arguments in *Perdue*." Ms. Morris's reliance on *Perdue* is misplaced. *Perdue* was purely a statutory fee case arising out of a civil rights case resulting in a consent decree. There was no common fund recovered for plaintiffs. Therefore, understandably, there was only a statutory fee award, and the lodestar was used to determine what defendant had to pay. Here, it is not about what defendant has to pay, but about what the clients have to pay the lawyers for the common fund the lawyers created and recovered in their behalf, and the law is very clear that this involves a different analysis, specifically use of the seven factors to determine the proper percentage of the fund to be awarded.

Ms. Morris further argues that "the *Bywaters* decision is relevant because it establishes the meaning of the term 'reasonable attorneys' fee' under the URA—which would necessarily be the 'reasonable attorneys' fee' if this case went to trial." She then holds fast to her misguided concept that what the defendant has to pay the plaintiff and what the plaintiff pays his or her lawyer are identical in common fund cases, but of course they are not, as *Staton* and many others have held. She finishes by criticizing the *Haggart* decision by Judge Lettow, for not agreeing with her misguided position. While Ms. Morris may not like it, *Haggart* adequately explained why *Bywaters* was of no moment, as Class Counsel previously cited. (D.E. 106, at 8) (*citing Haggart v. United States*, 116 Fed. Cl 131, 144 n. 15 (2014)). *Bywaters v. United States*, 670 F.3d 1221 (Fed. Cir. 2012)*, like *Perdue,* was purely a statutory fee case. The settlement agreement in *Bywaters* even stated the lawyer chose not to seek fees from the common fund. *Bywaters,* 670 F.3d at 1225. Obviously then, the lodestar was used to determine what defendant had to pay. Here, again, it is not about what defendant has to pay, but about what the clients have to pay the lawyers for the common fund the lawyers created, and the law is very

clear that involves a different analysis, specifically use of the seven factors to determine the proper percentage of the fund to be awarded.  (D.E. 106, at pp.9-10).

Ms. Morris also seems to make the argument that there would be some different method of awarding fees to the attorney from the client if the case went to trial.  To the extent *Brytus v. Spang & Co.*, 203 F.3d 238 (3d Cir. 2000) is being relied upon, it is misplaced.  In *Brytus*, the Third Circuit upheld a low fee award because "it is enough to hold that the District Court here did not abuse its discretion."  *Id.* at 247.  In doing so, the court noted some difference in its unique opinion between cases that settle and cases that go to judgment, noting that "[t]his court also has approved an award of fees from the common fund when the case has settled."  *Id.* at 246, citing *In re Fine Paper Antitrust Litig.*, 751 F.2d 562, 583 (3rd Cir. 1984) ("settlements releasing defendants from both damage and statutory fee liability … result in a fund in court from which fees [can] be awarded under the equitable fund doctrine.").  The dissent also noted, "my colleagues freely concede, as they must, that common fund fee awards are routinely given in settled cases in which a statutory fee provision would have applied had the case gone to judgment."  *Brytus*, 203 F.3d at 248.  Of course, the present case has settled, whereas *Brytus* went to judgment.  Thus, even *Brytus* itself, which is not within the massive majority even within its own circuit, still destroys Ms. Morris's argument in this case, since *Brytus* acknowledges that in a settlement, which is what is involved here, the attorneys can and do get more than statutory fees.[1]

---

[1] It should be noted that *Brytus* is a total outlier, in terms of its reasoning regarding a possible distinction between requesting fees in the context of settlement versus after a judgment, as well as the low fees that were awarded.  Indeed, the dissent in *Brytus* made the same observation and analyzed the strange logic of the decision concerning the possible different result when fees are requested while settling as opposed to after judgment.  203 F.3d at 247-48.  Furthermore, regarding the amount awarded, when one studies class action fee recoveries, one can see both very low awards and very high awards, but they should not be drivers of the result here because

4

Ms. Morris also discusses the rationale behind common fund.  There is nothing inconsistent with the rationale of the common fund and applying it here, as shown by its consistent use by courts around the country, as already discussed previously.  As *Staton* stated, it is an equitable substitute for fee agreements (327 F.3d at 967), or as Judge Bruggink stated in *Moore*, "class counsel may request an award of fees from the common fund on the equitable notion that lawyers are entitled to reasonable compensation for their professional services from those who accept the fruit of their labors." *Moore*, 63 Fed. Cl. at 786.  That is also, more importantly, why the Supreme Court in *Boeing* simply stated the rule that "a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing*, 444 U.S. at 478.  In any event, it certainly would be a huge inequity for the class members to pay a fee under 5% or perhaps nothing, as Ms. Morris seems to want Class Counsel to get for our efforts and success.

In conclusion, Class Counsel respectfully disagrees with Ms. Morris's position, and requests that her objection to Class Counsel's fee request be overruled, and that the Court grant Class Counsel's request for a fair percentage fee award from the common fund created by the settlement here.

## II.   CLASS COUNSEL'S REPLY TO THE UNITED STATES' RESPONSE TO MOTION FOR APPROVAL OF FEES AND DIVISION OF COMMON FUND

The United States has submitted a response brief to Class Counsel's motion for court approval of fees and proposed division of the common fund.  Class Counsel previously filed a motion stating his position that the government lacks standing, and for the record maintains that objection.  (D.E. 106.)  If the Court decides to entertain the merits of the government's "no

---

undoubtedly the particular facts and work of the attorneys were, and maybe even the personalities before that trial judge, are what drove a particular award.

position" response, Class Counsel shows herein that the government's arguments should be rejected.

## A.      The Common Fund Doctrine Applies

The government makes the curious argument that the common fund doctrine might not apply in this case.  That is not true.  As stated by the Supreme Court in a case cited by the Defendant, the common fund doctrine applies where: (1) "the classes of persons benefitted by the lawsuits [are] small in number and easily identifiable"; (2) "the benefits [can] easily be traced with some accuracy"; and (3) "There was reason for confidence that the costs of litigation could indeed be shifted with some exactitude to those benefiting."  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478-479 (1980), *quoting Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 265 n. 39 (1975) (internal quotations omitted).  Furthermore, as stated by the Ninth Circuit: "The description of the total amount of the fund need not take any particular form and could result from adding up separately enumerated amounts in the agreement."  *Staton v. Boeing Company*, 327 F.3d 938, 971 n. 21 (9th Cir. 2003).

It is simply obvious that all of the elements above are met, as the class here is small and identifiable, the benefits to the class members cannot only easily be traced with some accuracy but can exactly be traced, and there is confidence that the costs of litigation can be shifted with not just some but perfect exactitude.  Indeed, numerous CFC rails-to-trails cases hold the common fund doctrine applies.  *See Moore v. United States*, 63 Fed. Cl. 781, 785-86 (2005); *Janssen v. United States*, No. 09-559L, 2013 U.S. Claims LEXIS 1794, at \*2 n.1 (Fed. Cl. November 14, 2013); *Bishop v. United States*, No. 10-594L, 2013 U.S. Claims LEXIS 1126, at \*2; *Raulerson v. United States*, 108 Fed. Cl. 675, 680 (2013); *Miller v. United States*, No. 03-

2489L, at 2 (Fed. Cl. November 17, 2006); *Haggart v. United States*, 116 Fed. Cl. 131, 142 n.13 (2014).

While the Supreme Court's test is met, and Class Counsel cites cases that are on point that show the common fund applies, the government has no authority for its argument that the common fund doctrine does not apply in opt-in cases. In fact, all the cases cited by the government are inapposite.

In *Knight v. United States*, 982 F.2d 1573, 1581 (Fed. Cir. 1983), the government was not held liable, and there was no fund at all "under the control of the court against which attorney fees could be assessed." Rather, the issue was about beneficiaries of work the lawyer did not represent at all. *Id.*

In *Holbrook v. Pitt*, 748 F.2d 1168, 1175 (7th Cir. 1984), the defendant, HUD, did not pay any money so no fund was created. HUD essentially contracted to provide housing assistance payments to a housing project owner for the benefit of plaintiff-tenants. *Id.* As the court stated, "[t]here was never any judgment for plaintiff nor for the classes which created any fund. Nothing in the way of money or otherwise was transferred by HUD to any fund as a result of this action." *Id.*

The case of *Applegate v. United States*, 52 Fed. Cl. 751 (2002) does not apply on its face. Importantly, it was not a class action. Furthermore, the question was what would the losing party pay under the losing party's settlement agreement with the plaintiffs that called for a reasonable fee. It did not involve the issue in the present case, which is what do the clients pay as the fee to their lawyer.

The government's reliance on *Brytus v. Spang & Co.*, 203 F.3d 238 (3d Cir. 2000), for the proposition that even if a common fund exists, it does not necessarily mean that the common

fund doctrine applies in this case, is equally misplaced, for the same reasons Ms. Morris's reliance on *Brytus* is misplaced as discussed above.

The government also suggests it is "not apparent why this Court should exercise its equitable powers to make a common fund award of attorneys' fees. . . ." (D.E. 107, at p.5.) Class Counsel already cited all of the relevant law in its initial brief on this point, and will not do so again. Suffice it to say that no less of an authority than the Supreme Court stated very clearly in *Boeing* that "this Court has consistently recognized that a … lawyer who recovers a common fund for the benefit of … his client is entitled to a reasonable fee from the fund as a whole." *Boeing*, 444 U.S. at 478 (1980).

The government also states that "Because Class Counsel is not asking the Court to enforce a contingency fee agreement *Venegas*, however, does not apply." (D.E. 107, at p.5.) The government misses the point. Like a contingent fee contract, but unlike a fee shifting statute, the common fund doctrine imposes no additional liability on a defendant. *Staton*, 327 F.3d at 967. Instead, the equitable doctrine results in fee spreading between plaintiffs as opposed to fees shifting to the defendant, and it exists to ensure that each class member pays a proportional share of the reasonable fees that class counsel earned. **"Common fund fees are essentially an equitable substitute for private fee agreements where a class benefits from an attorney's work,"** which is also why "**the same general principles outlined in *Venegas* should apply**." *Id.* at 968 (emphasis added).

**B.     It is Appropriate to Award Fees Based Upon a Percentage of the Fund**

The government insultingly suggests that while the CFC has awarded percentage of the common fund recoveries in rails-to-trails cases (indeed, they have never been disallowed), it has not actually taken a "hard look" at it. (D.E. 107, at p.6.) Not only is that an affront to the CFC

judges who have in fact considered and ruled on that issue, but it is also extremely ironic considering the government itself sat at the table during all of those fairness hearings.  In any event, Class Counsel will largely rest on the authority already cited in its initial brief, except to respond to the particular cases and arguments made by the government.

The government's apparent attack on the reasoning of *Moore* is frankly bizarre and ultimately irrelevant.  (D.E. 107, at pp.6-7.)  The government apparently does not like some of the comments made by the Court concerning its reasoning, but the fact is that *Moore* simply followed established precedent regarding awarding percentage of fee recoveries from the common fund.  However, again, there are a plethora of both CFC cases involving rails-to-trails, and many other class actions, in which common fund recoveries were awarded, despite the government's apparent concern with the underlying rationale concerning incentives and the like.  Nevertheless, Class Counsel notes that the government is simply putting its head in the sand and acting in its own interests when it suggests that limiting counsel to statutory fees would not have an impact on future litigation.  It clearly would, as no reasonable counsel would routinely take rails-to-trails cases, which are complex and take many years to settle for most cases, if counsel would be limited to statutory fees.  The government's obvious interest in limiting counsel to statutory fees is so there will be fewer rails-to-trails cases, decreasing the government's liability.

The government then cites *Bywaters*, apparently supporting its contention that the lodestar is really what counsel is limited to, and that anything else is an "enhancement."  (D.E. 107, at pp.8-9.)  This is fundamentally wrong.  Class Counsel explained all of this in his initial brief, but this CFC's ruling in *Haggart* show the government's misguided use of *Bywaters*:

> [The objector] Mr. Woodley vigorously contested the validity and application to this settlement of a contingent fee agreement based on a common fund, arguing that the purpose of the Uniform Relocation Act was to give class members 100% of the just compensation owed to them.  Hr'g Tr. 43:7-23. In support of this

argument he pointed to *Bywaters*, 670 F.3d 1221. Hr'g Tr. 43:24 to 45:2.   **Mr. Woodley's reliance on *Bywaters* is misplaced.**

\*\*\*

Mr. Woodley interprets the court's statement in *Bywaters* that "[t]he award of fees thus depends on construction of the U[niform ]R[elocation ]A[ct ] and not Rule 23," 670 F.3d at 1227, to mean that the Uniform Relocation Act is the *only* means of seeking attorneys' fees in a rails-to-trails case, and a court may not grant fees under RCFC 23 (h). Hr'g Tr. 44:9-17.   **The immediately preceding sentence, however, explains why the Uniform Relocation Act governed in *Bywaters* and RCFC 23 was irrelevant to the case.   It states, "The district court's award of attorneys' fees <u>in this case</u> was quite clearly based upon the mandatory fee-shifting provision of the U[niform ]R[elocation ]A[ct ]."   *Id.* at 1227.   In *Bywaters*, class counsel *chose* not to pursue a percentage of the common fund**, but instead exclusively to pursue attorneys' fees under the Uniform Relocation Act.   *See* Stipulation and Settlement Agreement, *Bywaters v. United States*, No. 6:99-cv-451, ¶ 21(b) (E.D. Tex. Jul. 31, 2009), ECF No. 158.[2]   **It does not follow that class counsel in other cases would be barred from seeking fees under Fed. R. Civ. P. 23 (h) or RCFC 23(h)**.

116 Fed. Cl. at 144 fn. 15 (emphasis added).   Nothing in the government's argument here undermines this Court's correct explanation as to why the objector in *Haggart* had misplaced reliance on *Bywaters*.

**C.   A Lodestar Cross-Check May or May Not Be Performed in the Court's Discretion, but the Ultimate Test is Based on the Seven Factors**

As in *Haggart*, in making its ultimate determination, the Court should consider the seven factors below, which demonstrate that a 35% fee from the common fund is appropriate here:

(1) the quality of counsel;
(2) the complexity and duration of litigation;
(3) the risk of non-recovery;
(4) the fee that likely would have been negotiated between private parties in similar cases;
(5) Any class member's objections to the settlement terms or fees requested by class counsel;
(6) the percentage applied in other class actions; and

---

[2] The Settlement Agreement in *Bywaters* cited by the Court in *Haggart* specifically states that "Class Counsel here agrees to seek their recovery of attorneys' fees and costs not from Class Members themselves (under a 'common fund' theory whereby Class Counsel seeks a percentage of the award to claimants), but from Defendant under the URA."

(7) the size of the reward.[3]

That indeed is the ultimate test.  Performing a lodestar cross-check can certainly be done, but it does not act as a litmus test, and there is no requirement that it be done.  *See, e.g., Nilsen v. York Cnty.*, 400 F. Supp. 2d 266, 271-72 (D. ME. 2005), citing *Third Circuit Task Force Report, Selection of Class Counsel*, 208 F.R.D. 340 (2002) ("expressing skepticism of even this limited use of the lodestar; 'the lodestar is at most a relevant factor ... and it should not receive exaggerated importance.'").

In the present case, Class Counsel suggests that the result is what is most important.  The result here was extraordinary and obtained in the face of stiff and consistent opposition from the government during both the liability and damage phases.  Class Counsel put in a significant amount of work over a number of years, involving approximately 2500 hours to date (more than was incurred at the time Class Counsel's fee bill was provided to the government, for the purposes of negotiating a statutory attorneys' fees settlement).  Class Counsel takes exception to the government's statement that "large compensation amounts are often primarily a function of the value of the property taken rather than class counsel's exceptional skill or effort (D.E. 107, at p.9)," since in this case a great deal of skill and effort was required on a relatively small land

---

[3] *Haggart*, 116 Fed. Cl. at 145, *citing*; *Raulerson v. United States*, 108 Fed. Cl. 675, 679-80 (2013); *Bishop v. United States,* No. 10-594L, 2013 U.S. Claims LEXIS 1126, 2013 WL 4505991, at *4 (Fed. Cl. Aug. 19, 2013)*; see also Sullivan v. DB Invs., Inc.* 677 F. 3d 273, 330 & nn. 62-63 (3d Cir. 2011) (en banc) (reciting, with approval, a similar list of factors applicable in the Third Circuit); *see also In Re: Certainteed Fiber Cement Siding Litig.,* 2014 WL 1096030 (E.D. PA. Mar. 20, 2014); *In Re: Fannie Mae Sec. Litig.,* 2013 WL 6383000 (D.D.C. Dec. 6, 2013), a*ppeal dismissed*, 2014 WL 1378762 (D.C. Cir. Apr. 3, 2014); *In Re: Cendent Corp. PRIDES Litig.*, 243 F.3d 722 (3d Cir. 2001); *Goldberger v. Integrated Res. Inc.*, 209 F.3d 43 (2d Cir. 2000); *Court Awarded Attorney Fees, Report of the Third Circuit Task Force on Court Awarded Attorney's Fees*, 108 F.R.D. 237 (1985); *Theodore Eisenberg & Geoffrey P. Miller, Attorney Fees and Expenses in Class Action Settlements*: 1993-2008, 7 J. Imperial Legal Stud. 248 (June 2010).

mass, involving very complex appraisals and advocacy, to obtain by what by any measure was a huge victory for the Plaintiffs.

### III.   CLASS COUNSEL'S STATEMENT IN SUPPORT OF APPROVAL OF SETTLEMENT AND REQUESTED FEES

What follows is a summary of the statements and arguments Plaintiffs made at the fairness hearing on the record. Much of the Plaintiffs' arguments were set out in the briefing before the Court in relation to the fairness hearing and made elsewhere in this filing. Therefore, Plaintiffs attempt to give a full account of the presentation while minimizing repetition.

Five and one half years after filing this case and after much work and many challenges and phases of this litigation, we are at last at a point where the Court may consider a settlement that Class Counsel believes is fair and reasonable to the landowners. Sixty-four of the Plaintiffs specifically consented in writing to all aspects of the settlement, including a reduction of their recovery of the effective rate of 29.5% for attorneys' fees. One of the Plaintiffs, Ms. Morris, has objected to Class Counsel's fees, but has not objected to any other aspect of the settlement.

The notice that was sent out to each class member was very clear that 35% was going to be requested. And, furthermore, the individual disclosure statement approved by the Court specifically gave the class members their net recovery including after the deduction of attorney's fees. So, each class member was aware of the 35% fee and that they were consenting to it.

The overwhelming consensus in the case law in this country is to apply a percentage of the fund approach to awarding attorneys' fees in a class action context, including where fee shifting statutes are present. There are outliers, both high and low, in terms of what percentage is applied. That is to be expected. However, there is no authority for arguing that counsel only gets statutory fees when a fee shifting statute is in place. That is simply not the law anywhere.

In *Boeing*, as it has in many cases, the Supreme Court made it clear that percentage of the fund approach is what should be used in class actions like this one. The Court held that, "this Court has consistently recognized that a . . . lawyer who recovers a common fund for the benefit of . . . his client is entitled to a reasonable fee from the fund as a whole." *Boeing,* 444 U.S. at 478 (1980). The presence of fee shifting statutes does not govern or limit what the client should pay the lawyer, and thus, the percentage of the fund approach can still be used in a common fund case such as this one. There are numerous such cases, including the Supreme Court's decisions in *Venegas* and *Alyeska*, as well as the many decisions following, such as *Staton* from the Ninth Circuit, and all of the CFC cases Class Counsel cited which are rails-to-trails cases.

The real question is what is a reasonable percentage fee under these circumstances? Courts have enumerated seven factors to consider when conducting that analysis, as discussed in prior briefing. (D.E. 106, at pp.9-10.) Those factors include analyzing what other courts have done. The *Haggart* decision is another very good roadmap, as is the *Moore* decision, both rails-to-trails cases from the CFC by Judge Lettow and Judge Bruggink.

Plaintiffs submit that the most important factor to consider is the result obtained by Class Counsel. Courts certainly seem to focus on that, and it is no wonder since the Plaintiffs' interests and Class Counsel's interests are perfectly aligned in a percentage of the fund approach in terms of the results, since they both want the best monetary result. And there is no question that this was an outstanding result. At the beginning of this case, no one had any expectation of recovery. Not one Plaintiff brought their own suit by the time this case was filed, which was nearly five years into the statute of limitations period. Not one Plaintiff brought their own suit thereafter. The only reason any of them brought the suit was because Class Counsel's firm came into contact with them, and through a long period of education and plain hard work, Class Counsel's

firm was able to inform the Plaintiffs of their rights.  Class Counsel submits that Plaintiffs have been represented well.

Under the settlement, the Government would pay a little over $11.2 million, which consists of a little over $7 million in property damages, a little over $3.5 million in interest, and about $585,000 in URA fees, which Class Counsel negotiated after providing his firm's fee bill to the Government so the issue did not have to be litigated, and a little more than $43,000 in reimbursable URA costs.  The average gross recovery is approximately $163,000 per landowner. Class Counsel are asking for a fee of 35% on the property damages plus interest part of the award or 35% of $10,596,611.46.  The requested fee, therefore, is $3,708,814.01, leaving the class members with nearly $6.9 million in property damages and interest.  But the class members would receive the benefit of the negotiated statutory fees of $585,535 which would be added back into their award.  Pursuant to Class Counsel's fee agreements with the class representatives and pursuant to some substantial case law, Class Counsel could claim a contingency fee on that statutory fee award, but Class Counsel hasn't done so.  So, the total net result to the landowners, when statutory fees are added back in, would be $7,473,332.39 or about $115,000 per average landowner. So, even though Class Counsel is asking for a 35% fee, from the landowners' perspective, after one considers the URA statutory fees being added back into their award, the effective fee to be paid by the landowners would only be about 29.5%.

The previous paragraphs dealt with an overview of the result and the numbers involved in this case.  In the following paragraphs, Class Counsel discusses the work done to secure that fantastic result.  As the Court can discern from the following bullet points, the work was substantial and challenging over these last five and one half years and the positive outcome depended on this work.  During this case, Class Counsel and his firm:

- Traveled to the National Archives and obtained the old railroad maps that show how the railroad originally acquired its interest in the land.

- Ordered deeds from the local property office.

- Read and analyzed each deed.

- Mapped each railroad segment from the old railroad map onto a modern parcel map.

- Determined who all the owners on the taking date were, which was not an easy task given five years had passed since the taking.

- Performed and analyzed a great deal of title work.

- Conducted legal research of all the issues Plaintiffs were likely to face in the case, including damages under Washington law.

- Traveled at least five separate times to Lacey, Washington, for meaningful and productive meetings with clients and for work with city officials for necessary documentation where we needed it.

- Analyzed cases that were issued during the pendency of this case, including this Court's decisions in the *Beres* case, which were studied as well as other decisions that impacted the claims here arguably.

- Researched, drafted and filed a motion and memorandum on class certification.

- Performed extensive work sorting out ownership of parcels in order to make sure the claims we were asserting was on behalf of people who owned on the taking date.

- Organized and, ultimately, served initial disclosures and supplemental disclosures through the case.

- Participated in multiple conferences and hearings with the Court including for class certification.

- Negotiated with the United States regarding the proper form of class notice.

- Tracked down the current locations of property owners.

- Delivered the class notice and followed up and organized the executed opt-in forms.

- Conducted meetings with landowners.

- Created the Claims Book, which is a large binder that has the title information, the entry of appearance and a map for every single claimant, to submit to the government for review.

- Worked with the Government to overcome or rectify any objections raised by the Government after review of the Claims Book.

- Worked with the government on very detailed stipulations.

- Prepared exhaustive briefing on summary judgment and responses to cross-motions for summary judgment on numerous legal issues, including;

    - whether trail use exceeded the scope of the easements.

    - whether, as argued by the Government, the damages should be severely limited to the difference between what it called the incremental value of the land encumbered by a railroad easement in a before condition versus it being encumbered by a recreational trail.

- Prepared for and traveled to Washington to present oral argument on the summary judgment motions whereupon Plaintiffs received a favorable, exhaustive 34-page opinion.

- Investigated the nature and impact on damages of intervening streets, *i.e.,* streets that run between the trail and the property in question.

- Performed extensive and difficult work with boundary line adjustments, and boundary line adjustment maps that were referenced in landowner deeds, which needed to be sorted out to ultimately prove ownership into the railroad right-of-way for many parcels.

- Responded to discovery requests from the Government, distributed the requests to every claimant, and worked with claimants to obtain responsive materials, and organized their responses and provided them to the Government.

- Analyzed the *Roeder Co. v. Burlington N.* case, a Washington State case dealing with the center line presumption in Washington.  In most states, if one owns land next to an easement, one is presumed to own to the center of the easement.  But, the *Roeder* case held that when a deed has a metes and bounds description that describes the edge of a railroad right-of-way, the centerline presumption does not apply.  *Roeder Co. v. Burlington N.*, 716 P.2d 855, 863 (Wash. 1986).  That formed the basis of a very real defense that the Government had to try to cut off ownership rights into the railroad right-of-way, and if the Government prevailed on that issue, those plaintiffs – and there were many of them – would have received nothing.  While this was an important issue, it did not necessarily negate the claims in Class Counsel's view, but it meant that those Plaintiffs did not have an evidentiary presumption.  Thus, Plaintiffs were going to have to prove our case without the benefit of an evidentiary presumption, which Class Counsel was ready to do with expert testimony in what promised to be a long and complicated trial on title issues.

17

- Reviewed materials obtained by subpoena from the Washington State Department of Transportation Commissioner's Office, the City Clerk of Olympia and City of Lacey for street and trail information.

- Measured the square footage at issue for every claimant's claim and provide proof of all of those in an online map which Class Counsel supplied to the Government and, ultimately, to the appraiser.  This work involved looking at GIS information, reading the deeds and doing hand measurements where necessary.

- Selected and worked with a joint appraiser.  The joint appraisal process was akin to a nonbinding arbitration in that we argued our positions, and the parties submitted written positions to the joint appraiser on various issues.

- Spent days preparing for the site visit with the appraiser, investigating the entire line and having in-depth conversations with many landowners with unique issues.

- Presented Plaintiffs' arguments to the appraiser and rebutted the government's positions.  It is Class Counsel's strong belief that the appraisal numbers would have been much lower for the class members had the appraiser accepted the government's positions.

- Negotiated the interest rate to be applied to the property damage award.

- Negotiated the statutory attorneys' fees to be reimbursed to the landowners.

Respectfully submitted,

Date:  October 10, 2014                    BAKER STERCHI COWDEN & RICE, L.L.C.

                                           By   /s/ Steven M. Wald
                                                Steven M. Wald
                                                J. Robert Sears
                                                1010 Market Street, Suite 950
                                                St. Louis, MO 63102-1708
                                                (314) 231-2925
                                                (314) 231-4857 (facsimile)
                                                wald@bscr-law.com
                                                sears@bscr-law.com

                                                -and-

                                                Thomas S. Stewart
                                                Elizabeth G. McCulley
                                                2400 Pershing Road, Suite 500
                                                Kansas City, MO 64108
                                                (816) 471-2121
                                                (816) 472-0288 (facsimile)
                                                stewart@bscr-law.com
                                                mcculley@bscr-law.com

                                                **ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing was filed with the Clerk of the Court via ECF on this 10th day of October, 2014, with a copy of the same being served via electronic mail (ECF) by the Clerk of the Court on this same day, to:


BRUCE K. TRAUBEN
Natural Resources Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663
E-mail: bruce.trauben@usdoj.gov

**ATTORNEY FOR DEFENDANT**


I also certify that the above and foregoing was served via email on this 10th day of October, 2014, to:

Gretchen Morris
lexmorris@gmail.com


_____*/s/ Steven M. Wald*___
ATTORNEY FOR PLAINTIFFS

20